**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                              No. CR 09-3206 JB

ANTONIO HUERTA-RODRIGUEZ,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence and Supporting Memorandum, filed March 9, 2010 (Doc. 24)("Motion to Suppress"). The Court held an evidentiary hearing on September 7, 2010. The primary issues are: (i) whether the Court should suppress evidence of the firearm found during the search of Defendant Antonio Huerta-Rodriguez' residence because the officers allegedly did not legally obtain entry into Huerta-Rodriguez' residence, and because Huerta-Rodriguez allegedly did not freely and voluntarily consent to the search; and (ii) whether the statements Huerta-Rodriguez made -- such as his statement that he had a firearm in his residence -- should be suppressed, because Huerta-Rodriguez allegedly made the statements during a custodial interrogation before the officers informed him of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Because the Court finds that the evidentiary record shows that Huerta-Rodriguez and Rosa Munoz, Huerta-Rodriguez' common-law wife, voluntarily allowed the officers to enter their residence, and that Huerta-Rodriguez freely and voluntarily consented to the search, the Court will not suppress evidence of the firearm. The Court will not suppress Huerta-Rodriguez' statements, because Huerta-Rodriguez made the statements

during a consensual encounter, and <u>Miranda v. Arizona</u> warnings are required only when a suspect is in custody.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. <u>See</u> Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269-70 (10th Cir. 1982), <u>cert. denied</u>, 461 U.S. 916 (1983). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. <u>See</u> Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. <u>See</u> <u>United States v. Merritt</u>, 695 F.2d at 1269.

1.    In September 2009, agents from the Region III drug task force were conducting an investigation into Fred Archuleta. <u>See</u> Affidavit for Search Warrant at 3, Defendant's Exhibit C;[1] Transcript of Hearing at 9:23-10:3 (taken September 7, 2010)(Gallegos)("Tr.").[2]

2.    While agents were conducting surveillance of Archuleta, they saw a charcoal-gray

---

[1] The United States and Huerta-Rodriguez introduced eight exhibits at the evidentiary hearing -- specifically, Defendant's Exhibits A, B-1, B-2, B-3, B-4, C, and D, and the United States' Exhibit 1.

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Dodge pick-up truck with the New Mexico license plate of JLY-483 visit the address several times. See Affidavit for Search Warrant at 3.

3.      A confidential informant told Agent Kevin Mondragon that the driver of the vehicle was Alejandro Estrada-Rodriguez.[3]   See Affidavit for Search Warrant at 3; Tr. at 9:8-11:2 (Gallegos, Cairns).

4.      The informant told Mondragon that Estrada-Rodriguez was Archuleta's cocaine supplier and that Estrada-Rodriguez was distributing cocaine throughout Rio Arriba County.  See Affidavit for Search Warrant at 3; Tr. at 9:8-11:3 (Gallegos, Cairns); id. at 14:9-13 (Gallegos).

5.      Based on this information, the agents began to investigate Estrada-Rodriguez during October 2009.  See Affidavit for Search Warrant at 3; Tr. at 9:5-11:3 (Gallegos, Cairns).

6.      Huerta-Rodriguez[4] is Estrada-Rodriguez' father-in-law. See id. at 42:17-19 (Esparza, Huerta-Rodriguez).

7.      Huerta-Rodriguez and Estrada-Rodriguez live next door to each other in Hernandez, New Mexico.  See id. at 42:20-21 (Esparza, Huerta-Rodriguez); Photograph, Defendant's Exhibit B-2.

8.      Agents conducted surveillance of Estrada-Rodriguez' home, and observed foot and

---

[3] The affidavit for the search warrant states that a confidential informant informed Mondragon that the driver of the vehicle was Alejandro Hector Hernandez-Rodriguez.  See Affidavit for Search Warrant at 3.  Neither party explained this discrepancy to the Court.  It appears that Huerta-Rodriguez' son-in-law's name is Alejandro Estrada-Rodriguez, and not Alejandro Hernandez-Rodriguez, see Motion to Suppress at 1; Tr. at 10:22-11:2 (Cairns), and that the name in the search warrant is a mistake.  The Court will therefore continue to refer to Huerta-Rodriguez' son-in-law as Estrada-Rodriguez.

[4] At the hearing, the defendant testified that his name is Rodriguez-Huerta, and not Huerta-Rodriguez.  See Tr. at 53:9-10 (Esparza, Huerta-Rodriguez).  Because his pleadings refer to himself as Huerta-Rodriguez, the Court will refer to him as Huerta-Rodriguez for the purpose of consistency and to avoid confusion.

vehicle traffic consistent with narcotics transactions.  See Affidavit for Search Warrant at 3.

9.      The agents were able to secure a search warrant for Estrada-Rodriguez' home, based on the information they had obtained.  See Search Warrant, Defendant's Exhibit C; Tr. at 10:22-11:1 (Cairns); id. at 10:1-6 (Cairns, Gallegos).

10.     On October 16, 2009, at approximately 9:30 p.m., New Mexico State Police officers and members of the Regional III Drug task force served and executed the search warrant at Estrada-Rodriguez' residence.  See Tr. at 11:1-24 (Gallegos, Cairns).

11.     During the search of Estrada-Rodriguez' residence, the agents found cocaine.  See id. at 12:9-13 (Cairns, Gallegos).

12.     Estrada-Rodriguez admitted to trafficking in cocaine and told agents that Archuleta was his customer.  See Amended United States' Response to Defendant's Motion to Suppress Evidence at 2, filed March 20, 2010 (Doc. 27)("Amended Response").[5]

13.     Because Mondragon possessed information identifying Huerta-Rodriguez as selling drugs as well, he instructed Officer Joey Gallegos to conduct a knock and talk at Huerta-Rodriguez' residence while the agents were searching Estrada-Rodriguez' residence.  See Tr. at 11:1-13 (Cairns, Gallegos); id. at 13:25-14:2 (Gallegos); id. at 26:16-20 (Esparza, Gallegos); id. at 32:20-23 (Esparza, Gallegos).

14.     The officers did not have a search warrant or an order to seize Huerta-Rodriguez' residence.  See id. at 13:25-14:5 (Cairns, Gallegos); id. at 32:24-33:1 (Esparza, Gallegos).

15.     When Gallegos approached Huerta-Rodriguez' residence, Huerta-Rodriguez was

---

[5] Neither party introduced evidence regarding whether Estrada-Rodriguez admitted to trafficking in cocaine, but neither party appears to dispute this statement.  This fact is not material or essential to the Court's holdings, and because the parties do not dispute this fact, the Court includes it to fully explain the surrounding events and to tell the story sequentially.

inside with Munoz and their children.  See id. at 43:18-24 (Esparza, Huerta-Rodriguez).

16.     Initially,  only Gallegos -- not several officers -- approached Huerta-Rodriguez'

residence.  See id. at 14:14-21 (Cairns, Gallegos).

17.     Gallegos knocked on the door, and Munoz answered.[6]  See id. at 29:8-24 (Esparza,

Gallegos).

18.     Munoz' primary language is Spanish.  See id. at 16:5-7 (Cairns, Gallegos); id. at 34:2

(Esparza).

19.     Gallegos speaks Spanish, and he spoke to Munoz in Spanish.  See id. at 16:5-15

(Cairns, Gallegos).

20.     Gallegos identified himself and explained to Munoz that the police were executing

a search warrant at her son-in-law's residence.  See Tr. at 16:17-17:17 (Cairns, Gallegos).

21.     Munoz became emotionally excited and concerned about her grandchild's safety.

See id. at 16:17-21 (Gallgeos).

22.     Gallegos informed Munoz that her grandchild was alright and that he would have

someone bring her grandchild over so that she could watch the child.  See id. at 17:13-17 (Gallegos).

23.     An officer brought Munoz' grandchild to her, and Munoz calmed down.  See id. at

18:7 (Gallegos).

---

[6] Munoz contends in her affidavit that, when she opened her front door to investigate the cause of the commotion, police officers came to the door and physically prevented her from closing it.  See Affidavit of Rosa Munoz, Defendant's Exhibit D.  The Court credits Gallegos' testimony over Munoz' testimony.  Gallegos testified in court and was subject to cross-examination.  Munoz did not testify in court and was not subject to cross-examination.  Huerta-Rodriguez also testified that he and his wife heard knocking on the door, and that his wife went to open the door.  See Tr. at 44:20-45:14 (Esparza, Huerta-Rodriguez).

24.     Officer Thomas Maez joined Gallegos outside of Huerta-Rodriguez' residence.[7]  See id. at 14:20-21 (Gallegos).

25.     Gallegos and Maez were both dressed in uniforms, with tactical vests that identified them as state police.  See Tr. at 18:21-23 (Gallegos); id. at 47:15-17 (Esparza, Huerta-Rodriguez).

26.     Huerta-Rodriguez joined Munoz at the door to their residence.  See id. at 18:8-10 (Cairns, Gallegos); id. at 57:11-58:3 (Esparza, Huerta-Rodriguez).

27.     Huerta-Rodriguez speaks only Spanish, and Gallegos spoke to him in Spanish.  See id. at 16:5-15 (Cairns, Gallegos).

28.     Gallegos asked Huerta-Rodriguez and Munoz for permission to enter their home.[8]  See Tr. at 18:8-18 (Cairns, Gallegos); 62:21-23 (Esparza, Huerta-Rodriguez).

29.     Gallegos testified that Huerta-Rodriguez and Munoz granted permission for the

---

[7] Huerta-Rodriguez contends that there were three officers at his door.  See Tr. at 59:9-15 (Esparza, Huerta-Rodriguez).  Although both Huerta-Rodriguez and Gallegos testified in court, and were subject to cross-examination, Huerta-Rodriguez' testimony was inconsistent at times.  For example, he asserted that the officers pointed their weapons at him and Munoz, and demanded that Huerta-Rodriguez sign a consent-to-search form, but also asked Huerta-Rodriguez for permission to search his residence.  See id. at 46:5-49:25 (Esparza, Huerta-Rodriguez).  Also, given Munoz' excitement, given that police were executing a search warrant next door, and given that police were at his door, the Court believes Huerta-Rodriguez may not have been as calm as the officer.  The Court will therefore credit Gallegos' testimony over Huerta-Rodriguez' testimony on how many officers were at his door.

[8] At the hearing, Huerta-Rodriguez testified that the officers asked for permission to enter.  See Tr. at 62:21-22 (Huerta-Rodriguez, Esparza).  This account differs with Munoz' sworn testimony in her affidavit.  Munoz asserts that the police officers physically prevented her from closing her front door, forcing her and her husband to feel that they had no choice but to sign the document permitting the police to search the residence.  See Munoz Aff.  The Court credits Gallegos' testimony and Huerta-Rodriguez' testimony over Munoz' sworn statements on whether the officers forced entry or secured permission, because both Gallegos and Huerta-Rodriguez testified in court and were subject to cross-examination, and the viva voce evidence was consistent.

officers to enter their home.[9]   See Tr. at 18:8-18 (Cairns, Gallegos); id. at 35:14-16 (Esparza, Gallegos).

30.     The officers did not inform Munoz or Huerta-Rodriguez that they had a right to terminate the encounter or to refuse permission to enter their residence.   See id. at 16:17-18:20 (Cairns, Gallegos); id. 35:8-36:11 (Esparza, Gallegos).[10]

31.     Huerta-Rodriguez and Munoz subjectively believed that they had no option but to allow the police officers into their home.   See Munoz Aff.; Tr. at 62:2-63:16 (Esparza, Huerta-Rodriguez);

32.     The officers were not aware that Huerta-Rodriguez and Munoz subjectively thought that they had no option but to allow the officers into their home.[11]   See Tr. at 16:17-19:15 (Cairns,

_____

[9] Huerta-Rodriguez never testified that he gave the officers permission to enter into his home, but he testified that the officers came into his residence.   See Tr. at 62:12-63:13 (Esparza, Huerta-Rodriguez).   The Court credits Gallegos' testimony over Huerta-Rodriguez' ambiguous testimony.

[10] The United States did not present evidence whether Gallegos informed Huerta-Rodriguez and Munoz of their right to terminate the encounter or to refuse permission to enter their residence. Huerta-Rodriguez did not present evidence whether the officers informed him or Munoz of their right to terminate the encounter or to refuse permission.   Although the Court finds that the officers informed Huerta-Rodriguez of his right to refuse consent to their request to search his residence, see Tr. at 36:3-11 (Esparza, Gallegos), the evidence does not suggest that Gallegos informed Huerta-Rodriguez or Munoz of their right to terminate the encounter or to refuse permission to enter their residence.   The Court thus finds that Gallegos did not inform them of these rights.   Neither party presented evidence that Maez informed Huerta-Rodriguez or Munoz of their right to terminate the encounter or to refuse permission to enter their residence.   Because Gallegos appears to have been the officer speaking to Huerta-Rodriguez and to Munoz, possibly because Gallegos spoke Spanish, the Court finds that it is unlikely that Maez informed Huerta-Rodriguez or Munoz of their right to terminate the encounter or refuse permission.   The Court therefore finds that neither officer informed Munoz or Huerta-Rodriguez that they had a right to terminate the encounter or to refuse permission to enter their residence.

[11] Neither the United States nor Huerta-Rodriguez presented direct evidence whether Gallegos or Maez knew of Huerta-Rodriguez' subjective belief, or Munoz' subjective belief, that they had no option but to allow the officers into their home.   Accordingly, the record is silent on this factual issue.   While the United States bears the burden of proving consent, the Court does not

Gallegos); id. at 34:24-35:16 (Esparza, Gallegos); id. at 38:22-39:2 (Esparza, Gallegos).

33.   Huerta-Rodriguez and Munoz had the option not to allow the police officers into their home. See id. at 62:21-22 (Huerta-Rodriguez, Esparza); id. at 18:10-11 (Gallegos); id. at 38:22-23:3 (Esparza, Gallegos).

34.   Gallegos testified that he, Maez, Huerta-Rodriguez, and Munoz walked to the living room, where he and Maez explained that agents were executing a search warrant at Estrada-Rodriguez' residence, and that the police had some information that Huerta-Rodriguez might have drugs in his residence.   See id. at 15:12-16:5 (Cairns, Gallegos); id. at 17:13-14 (Gallegos); id. at 18:11-15 (Gallegos); id. at 19:19-20 (Gallegos); id. at 34:2-4 (Esparza, Gallegos).

35.   Gallegos informed Huerta-Rodriguez and Munoz that they had a right to refuse to answer any questions that he asked them.   See id. at 36:3-5 (Esparza, Gallegos).

36.   Gallegos asked Huerta-Rodriguez for permission to search his residence for drugs and other illegal items.   See id. at 18:17-18 (Gallegos); id. at 19:19-22 (Gallegos); id. at 47:24-48:2 (Esparza, Huerta-Rodriguez).

37.   Gallegos read Huerta-Rodriguez the Consent to Search, which is in Spanish and informs the reader that he or she has a right to refuse consent to the search.   See Consentimiento de Buscar, United States' Exhibit 1 ("Consent to Search"); Tr. at 36:3-11 (Esparza, Gallegos); id. at

---

believe the officers had any hidden subjective knowledge; the totality of the circumstances, given the circumstantial evidence -- the Consent to Search's language and Gallegos' testimony that he secured voluntary and informed consent, see Tr. at 19:16-20:21 (Cairns, Gallegos) -- suggest the Court's finding.  Based on the facts established at the suppression hearing, the Court finds that the officers were not aware either of Huerta-Rodriguez' subjective belief or of Munoz' subjective belief that they had no option but to allow the officers into their home.  Cf. United States v. Orejuela-Guevara, 659 F. Supp. 882 (E.D.N.Y. 1987)("Based on all the facts established at the suppression hearing, there is 'no evidence . . . of coercion or other circumstances that would render the consent invalid.'")(quotation omitted).

39:7-15 (Esparza, Gallegos).[12]

38.     As translated, the Consent to Search states: "I have been told I have the right to decline permission to search.  Knowing I have the right to decline, I choose to give permission for the search.  I give this consent freely and voluntarily."  Consent to Search.  See Cassell's Spanish-English English-Spanish Dictionary 116, 218, 221, 226, 251, 393, 467, 527, 561, 598 (1978).

39.     The Consent to Search also informs the reader that the officers should not use promises, threats, or coercions to obtain consent to the search.  See Consent to Search; Tr. at 20:10-14 (Gallegos).

40.     Huerta-Rodriguez freely and voluntarily consented to the search both verbally and in written form.[13]  See Tr. at 19:19-20:2 (Cairns, Gallegos).

41.     Huerta-Rodriguez could have refused to sign the Consent to Search, which Gallegos read to him and which gave the police consent to search his home.  See Consent to Search;  Tr. at 20:10-13 (Gallegos); id. at 36:7-11 (Esparza, Gallegos).

42.     Huerta-Rodriguez subjectively believed that he no alternative but to sign the Consent

_____

[12] Huerta-Rodriguez contends that Gallegos did not read the Consent to Search to him.  See Tr. at 64:23-65:1 (Cairns, Huerta-Rodriguez).  The Court credits Gallegos' testimony over Huerta-Rodriguez' testimony because of the inconsistencies in Huerta-Rodriguez' testimony, such as his assertion that the officers demanded that he sign the Consent to Search, but asked for permission to search his home.

[13] Huerta-Rodriguez asserts that he signed the Consent to Search only because he felt that he had no choice.  See Tr. at 13-14 (Huerta-Rodriguez).  He asserts that the officers put pressure on him by pointing their weapons at him and his family, and by demanding that he sign the consent form.  See id. 48:16-49:18 (Esparza, Huerta-Rodriguez).  The Court credits Gallegos' testimony over Huerta-Rodriguez' testimony.  There are inconsistencies in Huerta-Rodriguez' testimony, such as Huerta-Rodriguez' assertion that the officers told him that they had a search warrant for the residence and pointed their weapons at him and his family, but then asked for his permission to search his home. See id. at 46:5-48:2 (Esparza, Huerta-Rodriguez).  Furthermore, it seems more unlikely than likely that the officers would point guns at Huerta-Rodriguez' family and then ask permission to search his home.

to Search, which Gallegos read to him and which gave the police consent to search his home.  See Tr. at 49:8-18 (Esparza, Huerta-Rodriguez).

43.     Huerta-Rodriguez subjectively believed that the officers had an order to search or seize his house.  See id. at 61:17-24 (Esparza, Huerta-Rodriguez).

44.     The officers did not tell Huerta-Rodriguez or Munoz, in Spanish or otherwise, that the  officers had an order to search the house or to seize the house.[14]  See id. at 35:17-24 (Esparza, Gallegos).

45.     The officers did not obtain permission to search Huerta-Rodriguez' residence through

---

[14] Huerta-Rodriguez testified that the officers told him and Munoz that they had a search warrant for their residence.  See Tr. at 61:17-24 (Esparza, Huerta-Rodriguez). The Court credits Gallegos' testimony over Huerta-Rodriguez' testimony on the issue whether the officers told him that they had an order to search his house and to seize his home, because of the inconsistencies in Huerta-Rodriguez' testimony, such as Huerta-Rodriguez' assertion that the officers told him that they had a search warrant for the residence, but then asked for his permission to search his home. See id. at 47:20-48:1 (Esparza, Huerta-Rodriguez). The Court does not believe that it is likely that Gallegos would have said they had an order to search the house and seize the house, but then ask for permission to search his home.   The Court also believes that it is more likely than not that Maez did not tell Huerta-Rodriguez or Munoz that the officers had a search warrant for their residence or an order to seize their residence.  Although neither party questioned Gallegos about what Maez told Huerta-Rodriguez and Munoz, it appears that Gallegos and Maez were together during the entire encounter.  See id. at 62:12-65:10 (Cairns, Huerta-Rodriguez).  It also appears that Gallegos was in charge of the encounter with Huerta-Rodriguez, as Mondragon assigned him to make contact with Huerta-Rodriguez.  See id. at 14:25-15:13 (Gallegos).  Based on the evidentiary record before it, the Court believes that Gallegos was the officer who was primarily speaking to Huerta-Rodriguez and Munoz, see, e.g., id. at 35:2-36:7 (Esparza, Gallegos), possibly because he spoke Spanish or was in charge of the encounter with Huerta-Rodriguez.  It is unlikely that Maez asserted that the officers had a search warrant for the residence or an order to seize the residence, because this statement would contradict the statements that Gallegos made, and because Gallegos was the officer who primarily spoke to Huerta-Rodriguez and Munoz.  Also, Huerta-Rodriguez testified that the "officers" told him they had a search warrant, and the Court has already determined that one of the officers did not make that statement, so Huerta-Rodriguez could not have been accurate in his use of the word "officers."  The Court therefore believes that neither officer told Huerta-Rodriguez or Munoz that they had an order to search the house or seize the house.

intimidation exceeding what police presence always brings.[15]   See id. at 19:4-15 (Cairns, Gallegos).

46.     Although the officers carried weapons, they did not draw their weapon at any time.[16]

See id. at 19:4-7 (Cairns, Gallegos).

47.     The officers did not physically touch Huerta-Rodriguez or Munoz.[17]   See id. at 19:8-

---

[15] Huerta-Rodriguez says that he believed he had to sign the Consent to Search, as the officers were demanding that he sign it, and were pointing their weapons at his wife and children. See Tr. at 48:16-49:18 (Esparza, Huerta-Rodriguez). The Court credits Gallegos' testimony over Huerta-Rodriguez' testimony on the issue of intimidation, because of the inconsistencies in Huerta-Rodriguez' testimony, such as Huerta-Rodriguez' testimony that the officers demanded that he sign the Consent to Search, and frightened him, but also asked for his permission to search his home. See id. at 47:20-48:16 (Esparza, Huerta-Rodriguez). It is more unlikely than likely that the officers would go to the trouble of securing permission, but then would use intimidation to secure consent.

[16] Huerta-Rodriguez testified that the officers pointed their weapons at him, Munoz, and their children.  See Tr. at 58:24-60:24 (Esparza, Huerta-Rodriguez).  The Court credits Gallegos' testimony over Huerta-Rodriguez' testimony on the issue whether the officers drew their weapons, because of the inconsistencies in Huerta-Rodriguez' testimony, such as Huerta-Rodriguez' testimony that the officers pointed their weapons at him and his family, but asked for permission to enter his residence and permission to search the residence.  See id. at 47:25-48:2 (Huerta-Rodriguez); id. at 58:24-60:24 (Esparza, Huerta-Rodriguez); id. at 62:21-23 (Esparza, Huerta-Rodriguez).  It is more unlikely than likely that Gallegos would point their weapons at Huerta-Rodriguez and his family, but ask for permission to enter their residence and search their residence.  The Court also believes that Maez did not draw his weapon.  Huerta-Rodriguez asserts that both officers aimed their weapons at Huerta-Rodriguez and his family.   See id. at 62:15-16 (Huerta-Rodriguez).  The Court, however, believes that it is more likely than not that Maez had a weapon, but did not draw it. First, Huerta-Rodriguez testified that the "officers" pointed their weapons at him and his family, but the Court has already determined that one of the officers -- Gallegos -- did not draw his weapon, so Huerta-Rodriguez could not have been accurate in his statement.  It also appears that Gallegos and Maez were together during the entire encounter.  See id. at 62:12-65:10 (Cairns, Huerta-Rodriguez). It also appears that Gallegos was in charge of the encounter with Huerta-Rodriguez.  See id. at 14:25-15:13 (Gallegos).  It is unlikely that Maez drew his weapon, and pointed it at Huerta-Rodriguez and his family, while Gallegos kept his weapon in its holster.  The Court thus will not credit Huerta-Rodriguez' testimony.  The Court finds that neither officer drew their weapons.

[17] Huerta-Rodriguez testified that the officers physically prevented Munoz from closing the door, see Tr. at 46:5-9 (Huerta-Rodriguez), but he did not testify that the officers physically touched him or his wife.  The Court has previously determined that the officers did not physically prevent Munoz from closing the door.  As Huerta-Rodriguez did not testify that Gallegos physically touched Huerta-Rodriguez or Munoz, the Court credits Gallegos' testimony that he did not physically touch

11 (Cairns, Gallegos).

48.     The officers did not raise their voices or yell at either Huerta-Rodriguez or Munoz.[18]

See id. at 19:12-15 (Cairns, Gallegos).

49.     After Huerta-Rodriguez signed the Consent to Search, Gallegos asked Huerta-

Rodriguez whether there were any drugs or weapons in the residence.  See Tr. at 21:5-7 (Cairns,

Gallegos).

50.     Huerta-Rodriguez told Gallegos that he had a firearm in the residence.  See id. at

21:9-12 (Cairns, Gallegos).

51.     Huerta-Rodriguez led Gallegos to the master bedroom, where the firearm -- a Colt

.357 Magnum handgun -- and ammunition for the firearm were located.  See Motion to Suppress at

2; Amended Response at 3; Tr. at 21:10-16 (Cairns, Gallegos).

52.     The Colt .357 handgun was a stolen firearm.  See Tr. at 23:9-14 (Cairns, Gallegos).

---

either Huerta-Rodriguez or Munoz.  It appears that Gallegos and Maez were together during the
entire encounter, and that Gallegos was in charge of the encounter with Huerta-Rodriguez.  See id.
at 14:25-15:13 (Gallegos); id. at 62:12-65:10 (Cairns, Huerta-Rodriguez).  It is unlikely that Maez
would use physical force when Gallegos, the officer who primarily conducted the encounter, did not.
Moreover, Huerta-Rodriguez testified that the "officers" physically prevented Munoz from closing
the door, but the Court has already determined that one of the officers -- Gallegos -- did not block
the door, so Huerta-Rodriguez could not have been accurate in his use of the word "officers."  The
Court thus finds that neither officer physically touched Huerta-Rodriguez or Munoz.

        [18] Although Huerta-Rodriguez testified that the officers spoke in a loud, hoarse tone of voice,
see Tr. at 51:12 (Huerta-Rodriguez), he did not testify that the officers raised their voices or yelled.
The Court believes that the officers could be loud and clear -- not mumbling -- without raising their
voices in a manner approximating yelling.  The Court therefore credits Gallegos' testimony that he
did not raise his voice or yell.  The Court also believes that Maez did not raise his voice or yell at
Huerta-Rodriguez or Munoz.  It appears that Gallegos and Maez were together during the entire
encounter, and that Gallegos was in charge of the encounter.  See id. at 14:25-15:13 (Gallegos); id.
at 62:12-65:10 (Cairns, Huerta-Rodriguez).  It is unlikely that Maez would yell or raise his voice
when Gallegos, the officer who primarily conducted the encounter, did not.  The Court thus finds
that neither officer yelled or raised his voice when speaking to Huerta-Rodriguez or Munoz.

53.     Huerta-Rodriguez told Gallegos that the handgun was his and that he had received it from his father-in-law shortly before his father-in-law's death.  See id. at 23:1-4 (Gallegos).

54.     At this time, Gallegos found Mondragon to notify him that he and Maez found a firearm in Huerta-Rodriguez' residence.  See id. at 23:4-6 (Gallegos).

55.     Mondragon read Huerta-Rodriguez his Miranda warnings in Spanish, and Huerta-Rodriguez agreed to speak to Mondragon.  See Amended Response at 3.[19]

56.     Huerta-Rodriguez told Mondragon that the handgun was his, and that he had received it from his father-in-law.  See Motion to Suppress at 2; Amended Response at 3.

57.     Huerta-Rodriguez also admitted to Mondragon that he was in the country illegally. See Tr. at 21:17-23 (Cairns, Gallegos).

58.     At that time, Huerta-Rodriguez was placed under arrest.  See id. at 19:8-11 (Cairns, Gallegos).

59.     Huerta-Rodriguez was arrested for possession of a firearm by a prohibited person -- an illegal alien.   See Motion to Suppress at 2.

## PROCEDURAL BACKGROUND

On November 4, 2009, a grand jury returned an indictment charging Huerta-Rodriguez with being an illegal alien in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5) and (a)(2).  See Indictment, filed November 4, 2009 (Doc. 10).  On March 9, 2010, Huerta-Rodriguez filed a motion to suppress the evidence against him, i.e., the firearm, ammunition, and statements he made to law-enforcement officers.   See Motion to Suppress at 1.  Huerta-

---

[19] Neither party introduced evidence regarding this fact, but the parties do not appear to dispute this fact.  The Court therefore finds that Mondragon read Huerta-Rodriguez his Miranda warnings following the search, and that Huerta-Rodriguez consented to speak with Mondragon.

Rodriguez did not seek the concurrence of Linda Matt, the Assistant United States Attorney, because of the nature of the motion, and because Huerta-Rodriguez' counsel believed that Ms. Matt opposed this motion.  See Motion to Suppress at 4.  At the time that Huerta-Rodriguez filed his motion to suppress, he was represented by Philip Medrano, an Assistant Federal Public Defender for the Albuquerque, New Mexico Federal Public Defender's Office.

Huerta-Rodriguez asked the Court, pursuant to the Fourth and Fifth Amendments of the United States Constitution and applicable federal case law, to suppress the evidence found in his residence and any statements that he made, because the evidence seized was the fruit of an illegal search and because any statements made were the result of custodial interrogation.  See Motion to Suppress at 1.  Huerta-Rodriguez contends that he did not voluntarily consent to the search, because he consented only because he believed that the officers had an order to search or seize his house and that he had no choice in the matter.  See Motion to Suppress at 3.  Huerta-Rodriguez also contends that the search was not a valid protective sweep, as the officers did not possess any articulable facts of criminal activity; instead, they obtained permission to search through intimidation.  See Motion to Suppress at 4.  Huerta-Rodriguez asked the Court to hold an evidentiary hearing on his motion. See Motion to Suppress at 4.

On March 20, 2010, Plaintiff United States of America filed the Amended United States' Response to Defendant's Motion to Suppress Evidence.  See Doc. 27.  The United States represents that the amendment reflects only changes to make the font consistent throughout the document and to correct the title of the filer.  See Amended Response at 1 n.1.  The United States contends that the encounter between Huerta-Rodriguez and the officers was consensual.  See id. at 3.  The United States contends that the officers encountered Huerta-Rodriguez at the doorway to his home after knocking, and were at all times respectful and courteous.  See id. at 5.  The United States further

-14-

contends that Huerta-Rodriguez consented, without being coerced, to the officers' entry into his home.  See id. at 5.  The United States contends that Huerta-Rodriguez also consented, both verbally and in written form, and without being coerced, to the officers' search of his home.  See Amended Response at 5.  The United States alleges that the officers never drew their weapons, never touched Huerta-Rodriguez, and never used loud voices.  See id. at 5.  The United States thus asserts that Huerta-Rodriguez' consent to the officers' requests to enter into his home and search his home was voluntary and without coercion, and thus his warrantless arrest following the consent was valid.  See id. at 4.  The United States asserts that Gallegos did not lie to Huerta-Rodriguez and that the officers did not do a warrantless entry based on a protective-sweep rationale.  See Amended Response at 6.

On June 23, 2010, Huerta-Rodriguez filed his Reply to the Government's Amended Response.  See Defendant's Reply to Government's Amended Response to Defendant's Motion to Suppress Evidence, filed June 23, 2010 (Doc. 48)("Reply").  At the time that Huerta-Rodriguez filed the Reply, Mario Esparza represented him.  Huerta-Rodriguez argued that the encounter was not consensual and that his consent to the search was not voluntarily obtained.  See id. at 3, 5.  He contended that, "even assuming the initial encounter between Mrs. Huerta and the task force officers was consensual, it became non-consensual immediately thereafter when the officers blocked the door so that she could not close it."  Id. at 3.  He argues that, even if the Court does not find that the officers blocked the door, the encounter was not consensual, because when the officers confronted Munoz, they "made visible displays of their badges, uniforms, and loaded weapons . . . [a]nd, more importantly, she was never advised of her right to terminate the encounter or refuse consent." See Reply at 3.  Huerta-Rodriguez contends that the officers told Munoz that they had a warrant and that if she refused consent, they had authority to seize her home.  See Reply at 3.  He also contends that the United States has not proved that the consent to search was given freely and voluntarily

because the officers were in full police uniform, had loaded weapons, and gave Huerta-Rodriguez and Munoz no indication that they were free to refuse to speak to the officers or that they had the right to refuse consent to the officers' request to search.  See id. at 4.

The Court held an evidentiary hearing on September 7, 2010.  Huerta-Rodriguez required the services of two Spanish-language interpreters at the hearing.  At the hearing, counsel for the United States contended that Huerta-Rodriguez' consent was voluntary.  See Tr. at 19:16-24 (Cairns, Gallegos).  Gallegos testified for the United States.  Gallegos stated that he asked Huerta-Rodriguez and his wife for consent to enter their home to speak to them, which they granted, and consent to search their home, which Huerta-Rodriguez granted both verbally and in writing.  See id. at 18:10-12 (Gallegos); id. at 19:19-20:21 (Cairns, Gallegos).  Gallegos contended that the consent was not coerced, as neither he nor Maez drew their weapons, touched either Huerta-Rodriguez or his wife, or raised their voices during the encounter.  See id. at 19:4-15 (Cairns, Gallegos).  Huerta-Rodriguez testified in his defense.  Munoz submitted an affidavit, but did not testify in Court because, as an illegal-immigrant, she was concerned about appearing in the courthouse.  Huerta-Rodriguez argued that he did not voluntarily consent to the search of his home.  See Tr. at 63:12-16 (Huerta-Rodriguez).  He contended that he signed the Consent to Search only because he was frightened, as the officers were pointing their weapons at his family and demanding that he sign the form.  See Tr. at 63:1-16 (Esparza, Huerta-Rodriguez).  He also contended that the officers told him and Munoz that they had a warrant to search their home.  See Tr. at 61:17-21 (Esparza, Huerta-Rodriguez).

## RELEVANT LAW REGARDING THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

### 1.    Relevant Law Regarding Fourth Amendment Searches.

Not all searches require a warrant.  The Supreme Court of the United States has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009)(quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  See Payton v. New York, 445 U.S. 573, 586 (1980).  As the United States Court of Appeals for the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d 1115, 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).

### a.    Warrantless Searches Conducted Pursuant to Consent.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).

Determining whether a party's consent was freely and voluntarily given is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."  United States v. Kimoana, 383 F.3d 1215, 1225 (10th Cir. 2004)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).  In determining whether a consent to search was free from coercion

> a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.  An officer's request for consent to search does not taint an otherwise consensual encounter "as long as the police do not convey a message that compliance with their request is required."

United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994)(citation omitted).  "If a consensual search is preceded by a Fourth Amendment violation, the government must prove both the voluntariness of the consent under the totality of the circumstances and that there was a break in the causal connection between the illegality and the evidence obtained."  United States v. McCurdy, 40 F.3d at 1119.

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's

failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse consent to a search for that individual's consent to be voluntary.   See Schneckloth v. Bustamonte, 412 U.S. at 232. Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but, because it is well-known that most law enforcement officers are armed, "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. 194, 205 (2002).  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

The Supreme Court has held that a search cannot be justified as lawful on the basis of consent "when that 'consent' has been given only after the [law enforcement] official conducting the search has asserted that he possesses a warrant." Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  In Bumper v. North Carolina, the defendant's grandmother told law-enforcement officers that they could conduct a search of the house after the officers told her that they had a search warrant for the house.  See 391 U.S. at 546.  The Supreme Court stated that the prosecutor's burden of proving that consent was freely and voluntarily given "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Id. at 548-49.  The Supreme Court stated: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion -- albeit colorably lawful coercion.  Where there is coercion there cannot be consent." 391 U.S. at 550.  The

Supreme Court thus held that the defendant's grandmother did not validly consent to the search. See id. at 550.

In United States v. Pena-Sarabia, 297 F.3d 983, 984 (10th Cir. 2002), officers obtained information indicating that the defendant and her husband had a large quantity of cocaine in their home. See 297 F.3d at 985. The officers did not have a search warrant, but decided to knock on the door and attempt to get consent to search the home. See 297 F.3d at 985. The officers testified that, after they knocked, the defendant opened the door. See id. at 985. The officers testified that they asked whether they could come in and search the home, and the defendant responded that they could. See id. at 985. The defendant testified that the officers walked into the home, and told her and her husband that they were going to search the house, so they did not think they had any options, "so we just -- he just says yes." Id. at 985. The district court found that "the testimony of the police officers [was] more credible," that the defendant "was unsure of her version of the events," and that her "recollection of detail appeared to be contrived or confused." Id. at 985. The Tenth Circuit upheld the district court's evaluation of the credibility of the witnesses and their testimony, and found that the United States presented clear testimony that the defendant gave consent to the search. See id. at 986. The Tenth Circuit found that the record indicated that the defendant's consent was not produced through coercion or duress, because the officers testified that the defendant voluntarily allowed the police to enter the home, the police did not draw or display their weapons, the police did not physically touch the defendant, and they did not induce consent through threats or trickery. See id. at 987. The Tenth Circuit thus held that the district court did not err in finding that, under the totality of the circumstances, the officers had consent to search the defendant's home. See id. at 987.

A defendant's subjective state of mind may be relevant to some degree on the issue of the

voluntariness of his or her consent, but it is not determinative if it does not overcome the other indicia that the defendant's consent was freely and voluntarily given.  See United States v. Hill, 199 F.3d 1143, 1150 (10th Cir. 1999).  In United States v. Sims, 428 F.3d 945 (10th Cir. 2005), the Tenth Circuit affirmed the district court's finding that the defendant gave voluntary consent for his car, hotel room, and personal belongings to be searched.  See 428 F.3d at 952.  The Tenth Circuit considered whether, given the defendant's mental condition -- there was evidence that he suffered from a degenerative disorder that could affect his judgment -- his consent was the freely and voluntarily given.  See id. at 953.  The Tenth Circuit found that the defendant did not point the court to any specific evidence of the extent of his impairment at the time of his consent to search, that the officers testified that the defendant's dysfunction was not apparent to them, that the defendant was cognizant enough to ask for an attorney before he made any statement to the police, and that the district court did not find evidence that the police attempted to exploit any of the defendant's vulnerabilities.  See id. at 953.  In a footnote, the Tenth Circuit mentioned Colorado v. Connelly, 479 U.S. 157 (1986), in which the Supreme Court refused to suppress the Defendant's confession on the grounds that it was not voluntary, even though the defendant was a chronic schizophrenic who at the time of his confession was suffering a hallucination that God was commanding him to confess, because the police were unaware of his condition and did not coerce the confession. See 428 F.3d at 953 n.2 (citing Colorado v. Connelly, 479 U.S. 157).  The Tenth Circuit stated:

> This police-perspective test has not yet been applied directly to a consent to search in any published circuit case this court has found.  The D.C. Circuit considered the question and noted that "[i]f police coercion . . . is also a necessary predicate to the finding that a consent to search is not voluntary, then the subject's particular 'vulnerable subjective state' would be relevant only insofar as the police knowingly took advantage of the vulnerability in eliciting a consent to search." United States v. Hall, 969 F.2d 1102, 1108 n.6 (D.C. Cir. 1992).

> We are not called on to answer this question in the instant case because we

conclude Sims's consent was voluntary despite his brain disorder; however, we note that since <u>Connelly</u> our cases have continued to rely on the familiar "totality of the circumstances" test articulated in <u>Bustamante</u> . . . .

428 F.3d at 953 n.2.

### b.   Warrantless Searches Conducted Pursuant to a Protective Sweep.

Searches conducted pursuant to a protective sweep constitute one of the exceptions to the Fourth Amendment's search-warrant and probable-cause requirements. See <u>Maryland v. Buie</u>, 494 U.S. 325, 334 (1990).  A protective sweep is a quick and limited search of premises incident to an arrest, and conducted to protect the safety of police officers or others.  See <u>Maryland v. Buie</u>, 494 U.S. at 334.  For a protective sweep to be upheld under the Fourth Amendment, the officers must have possessed a reasonable belief, based on specific and articulable facts, which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.  See <u>Maryland v. Buie</u>, 494 U.S. at 327.  The Tenth Circuit has interpreted <u>Maryland v. Buie</u> as meaning that a protective sweep may be conducted only incident to arrest.  See <u>United States v. Freeman</u>, 479 F.3d 743, 750 (10th Cir. 2007)("This Court has interpreted <u>Buie</u> to mean that a protective sweep may be conducted only if incident to arrest.").  See also <u>United States v. Walker</u>, 474 F.3d 1249, 1254 (10th Cir. 2007)("This Court has stated that a 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest.")(citations omitted).

### 2.   Relevant Law Regarding Fourth-Amendment Seizures.

For purposes of analyzing Fourth-Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000). A consensual encounter occurs when a police officer approaches a person to ask questions under

circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

To determine whether a particular encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005)(quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)).  "The test is objective (what would the police conduct have communicated to a reasonable person) and fact specific (based on 'all the circumstances surrounding the encounter')."  United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994). The Tenth Circuit has identified several relevant factors, including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

United States v. Spence, 397 F.3d at 1283.  The focus of the test is on the coercive effect of the police conduct, taken as a whole, on a reasonable person.  See United States v. Little, 18 F.3d at

1504.  The particular traits or "subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test set out in Bostick, 'other than to the extent that they may have been known to the officer and influenced his conduct.'"  United States v. Little, 18 F.3d at 1505.

In United States v. Spence, the Tenth Circuit found that, in light of the totality of the circumstances, the officers did not illegally seize the defendant in violation of the Fourth Amendment.  See 397 F.3d at 1284.  In United States v. Spence, Russian law-enforcement officials notified the United States Customs Service that the defendant "had paid to access Russian-based web sites featuring child pornography."  397 F.3d at 1282.  Three agents, dressed in plain clothes, went to the defendant's home to conduct a "knock and talk."  Id. at 1282.  When the defendant answered the door, the agents identified themselves and asked whether they could enter the defendant's home to talk.  See id. at 1282.  The defendant agreed.  See id. at 1282.  The agents informed the defendant that his name had been linked to web sites featuring child pornography and asked if they could search his computer.  See 397 F.3d at 1282.  The defendant orally agreed and signed a written consent form.  See 397 F.3d at 1282.  On appeal, the defendant challenged only the district court's conclusion that he was not unconstitutionally seized in violation of the Fourth Amendment.  See 397 F.3d at 1282.  The Tenth Circuit concluded that the encounter was consensual, because "the agents' conduct would have communicated to a reasonable person that their requests could have been declined and the encounter terminated at any time."  Id. at 1284.  Although the agents did not advise the defendant that he had the right to terminate the encounter or to refuse consent to the agents' request to enter his home, the Tenth Circuit found that the defendant was not seized within the meaning of the Fourth Amendment, because the agents were dressed in plain clothes, did not display their weapons at any time, did not raise their voices or physically touch the defendant, and did not take possession of the defendant's possession or belongings for any

measurable period of time.  See 397 F.3d at 1284.

## RELEVANT FIFTH-AMENDMENT LAW

The self-incrimination clause of the Fifth Amendment states: "No person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Statements made by a defendant during a custodial interrogation by a law-enforcement officer are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda v. Arizona requires.  See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008).  The requirements of Miranda v. Arizona, however, are limited.  "Police officers need not administer Miranda warnings to everyone they question."  United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008).  Rather, "Miranda applies only to 'custodial interrogation[s].'"  United States v. Jones, 523 F.3d at 1239 (quoting Miranda v. Arizona, 384 U.S.  at 444).  In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)).

A person is not in custody "simply because law enforcement officers question him, and a consensual encounter does not become custodial simply because the person being questioned is the target of an investigation."  United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir. 1996). The in-custody requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest."  Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  See United States v. Jones, 523 F.3d at 1239. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

being questioned.'"   United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).  In determining the custodial nature of an interrogation, the court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'"   United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the circumstances is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place.  See United States v. Jones, 523 F.3d at 1240.  Those factors include: (i) the degree to which the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523 F.3d at 1240.  The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others.  See United States v. Jones, 523 F.3d at 1240.

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth- or Fifth-Amendment rights, the police will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999.

## ANALYSIS

The Court finds that the officers did not illegally obtain entry into Huerta-Rodriguez' residence, because the surrounding circumstances demonstrate that the Munoz and Huerta-Rodriguez voluntarily allowed the officers to enter their residence during a consensual encounter. The officers conducted a warrantless search of Huerta-Rodriguez' residence pursuant to valid consent, because, during the consensual encounter, Huerta-Rodriguez freely and voluntarily

consented to the officers' request to conduct a search.[20]  During the encounter, the officers asked

Huerta-Rodriguez questions, and Huerta-Rodriguez answered the questions.  The Court will not

suppress these statements, because the officers asked the questions during a consensual encounter,

not during a custodial interrogation, and the officers therefore did not need to give Huerta-Rodriguez

the warnings that Miranda v. Arizona requires.

I.      **HUERTA-RODRIGUEZ CONSENTED TO THE OFFICERS' REQUEST TO ENTER HIS RESIDENCE, AND FREELY AND VOLUNTARILY CONSENTED TO THE OFFICERS' REQUEST TO SEARCH HIS RESIDENCE.**

Huerta-Rodriguez contends that the Court should exclude the evidence of the firearm and

ammunition as the fruit of an illegal search and seizure, because the officers actions' exceeded the

scope of a consensual encounter, and because he did not freely and voluntarily consent to the search

of his residence.  See Reply at 3-5.  The United States argues that the officers obtained permission

to enter into the house, and permission to search the house, during a consensual encounter.

See Response at 5-7.  Upon a careful consideration of the surrounding circumstances, the Court will

not suppress evidence of the firearm and ammunition, because it finds that the officers conducted

a valid consensual encounter, and obtained permission to enter into Huerta-Rodriguez' home and

Huerta-Rodriguez' voluntary consent to search his residence during the encounter.  See Manzanares

v. Higdon, 575 F.3d 1135, 1143 (10th Cir. 2009)(stating the officers do not have to possess a

_____

[20] In his Motion to Suppress, Huerta-Rodriguez contended that the search was not a valid protective sweep.  See Motion to Suppress at 3.  The United States asserted that "at no time did agents do a warrantless entry based on a protective sweep rationale."  Amended Response at 6.  At the hearing, Huerta-Rodriguez did not argue that the search was not a valid protective sweep; instead, he focused his argument on whether his consent was freely and voluntarily given.  The Court finds that the search of Huerta-Rodriguez' residence was not a valid protective sweep search, because it was conducted before Huerta-Rodriguez was arrested.  See United States v. Walker, 474 F.3d at 1254 (stating that the search could not be a protective sweep, because the defendant "had not yet been arrested when the officers conducted the sweep").  Because, however, the search was conducted pursuant to consent, the Court will not suppress the evidence found in the search.

warrant to conduct a consensual encounter because it is not a search or seizure for Fourth Amendment purposes).

### A.   THE OFFICERS OBTAINED ENTRY INTO HUERTA-RODRIGUEZ' RESIDENCE DURING A CONSENSUAL ENCOUNTER.

The warrant requirement for entry into a home has a few carefully established exceptions -- such as the consensual encounter, which "does not require a warrant because it is not a search or seizure for Fourth Amendment purposes." Manzanares v. Higdon, 575 F.3d at 1143 (citation omitted). Huerta-Rodriguez contests the United States' assertion that the officers obtained entry into his residence during a consensual encounter with Munoz and himself. See Reply at 2 (stating that Munoz conceded to the officers' demands and let them into her residence, only after the officers prevented her from closing the door and told her that they had a search warrant for her residence). The United States contends that Munoz and Huerta-Rodriguez consented, "without being coerced, to the police officers' entry into the house." Amended Response at 5. See Tr. at 75:12-14 (Cairns).

To determine whether a particular encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." United States v. Spence, 397 F.3d at 1283 (quoting Florida v. Bostick, 501 U.S. at 439). The court considers factors such as whether the officers touched or restrained the defendant, whether the officers were in uniforms, whether the officers displayed their weapons, the number of officers, the officers' tone and demeanor, and how long the officers retained the defendant's personal effects, and whether they specifically advised the defendant that he had the right to terminate the encounter or refuse consent. See United States v. Spence, 397 F.3d at 1283.

Upon a careful consideration of the surrounding circumstances, the Court finds that the

-29-

officers' conduct would not have communicated to a reasonable person that he or she was not free to terminate the encounter. Although Huerta-Rodriguez and Munoz contend that they subjectively believed that they had to let the officers into their residence, because the officers physically prevented Munoz from closing the door, and that the officers told Huerta-Rodriguez and Munoz that they had a search warrant for their residence, the Court has credited Gallegos' testimony that the officers did not prevent Munoz from closing the door, and that the officers did not tell Huerta-Rodriguez or Munoz that they had a search warrant for their residence. The Court has also credited Gallegos' testimony that he asked for permission to enter the residence, which Huerta-Rodriguez and Munoz granted.

The Court finds that a reasonable person would have felt free to decline Gallegos' request for permission to enter the residence and thus concludes that the officers obtained consent to enter Huerta-Roderiguez' home during a consensual encounter. Gallegos approached Huerta-Rodriguez' residence by himself. When Munoz answered the door and was concerned about her grandchild, Gallegos allayed Munoz' worries. Maez later joined Gallegos, and Huerta-Rodriguez later joined Munoz. The officers' presence was not threatening given their conduct and demeanor -- specifically Gallegos' actions in allaying Munoz' concerns. See United States v. Zapata, 997 F.2d at 754, 758 (finding that the encounter remained consensual, because the conduct and demeanor of the two officers was non-threatening when one officer questioned the defendant while the other officer stood back and watched). Although both officers were dressed in uniforms and wearing vests, law-enforcement officers often wear uniforms, and neither officer wore a mask or similar covering. The fact that Gallegos and Maez wore uniforms therefore does not -- without more -- create a coercive atmosphere. See United States v. Magee, 816 F. Supp. 1511, 1516 (D. Kan. 1993)(finding that the encounter was consensual, and the defendants were not seized when the defendants voluntarily

stopped their vehicle; the troopers, although dressed in complete uniforms and wearing guns, did not unholster their weapons and did not block the defendant's path with their vehicle). During his conversation with Munoz, Gallegos did not draw his weapon, raise his voice, or physically touch Munoz. When Huerta-Rodriguez came to the door to speak to Gallegos and Maez, neither officer drew his weapon, raised his voice, or physically touched Huerta-Rodriguez. During the conversation with Munoz and Huerta-Rodriguez, neither officer asked to examine either Huerta-Rodriguez' or his wife's personal effects. Although Gallegos and Maez did not inform Huerta-Rodriguez or Munoz of their right to refuse the officers' request to enter their residence, the absence of such a statement does not convert the encounter into a seizure. See United States v. Spence, 397 F.3d at 1284 ("An explicit advisement [that the defendant has a right to terminate the encounter] . . . 'is not a requirement; it is merely a factor to be considered in the totality of the circumstances'")(emphasis in original)(citation omitted).

The officers' conduct would have communicated to a reasonable person that they were free to decline the officers' request to enter their residence, because the officers' presence did not constitute a threatening police presence, the officers did not draw their weapons, raise their voices, or physically touch Huerta-Rodriguez or Munoz, and the officers did not ask for or retain any of Huerta-Rodriguez' or Munoz' personal effects. See United States v. Spence, 397 F.3d at 1284 (finding that the encounter was consensual when, although the agents did not advise the defendant that he had a right to terminate the encounter or refuse their request to enter into his home, the agents were dressed in plain clothes, did not display their weapons at any time, did not raise their voices or physically touch the defendant, and did not take possession of the defendant's personal effects or belongings for any measurable period of time). Although Huerta-Rodriguez and Munoz might have subjectively felt that they could not terminate the encounter, their undisclosed subjective

state of mind is irrelevant to the reasonable person test set out to determine whether a person was illegally seized.  See United States v. Little, 18 F.3d at 1505 (stating that the particular traits or "subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test set out in Bostick, 'other than to the extent that they may have been known to the officer and influenced his conduct.'").  There is no evidence that the officers knew Huerta-Rodriguez' subjective thoughts or that his subjective thoughts influenced their actions.[21]  The Court thus finds that the officers obtained entry into Huerta-Rodriguez' home during a consensual encounter.

### B.  HUERTA-RODRIGUEZ FREELY AND VOLUNTARILY CONSENTED TO THE OFFICERS' REQUEST TO SEARCH HIS RESIDENCE.

When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d at 1366 (citation omitted).  Huerta-Rodriguez contends that he did not unequivocally, specifically, freely, and voluntarily give consent to the officers' request to search his residence.  See Motion to Suppress at 3; Tr. at 70:2-9 (Esparza).  The United States contends that Huerta-Rodriguez freely and voluntarily gave consent to the officers' request to search the residence.  See Amended Response

---

[21] The Court's analysis whether the officers obtained entry into Huerta-Rodriguez' residence during a consensual encounter is closely intertwined with its analysis whether Huerta-Rodriguez' consent to the search of his residence was consensual.  In the Court's analysis whether Huerta-Rodriguez and Munoz were illegally seized, it relied on its factual finding that the officers were not aware that Huerta-Rodriguez and Munoz subjectively thought that they had no option but to allow the officers into their home. The United States did not provide direct evidence to show that the officers were not aware of Huerta-Rodriguez' subjective thoughts or of Munoz' subjective thoughts.  Huerta-Rodriguez also did not present evidence on the issue.  The government bears the burden of proving that the defendant's consent to a search was freely and voluntarily given.  See United States v. Harfst, 81 F.3d 173, at *2 (10th Cir. 1996)(citation and internal quotation marks omitted).  The Court found, based on the totality of the circumstances, after considering the witnesses' testimony, and weighing the witnesses' credibility, that the United States established by a preponderance of the evidence that the officers were not aware that Huerta-Rodriguez and Munoz subjectively thought that they had no option but to allow the officers to enter their home.  See footnote 11 supra.

at 6; Tr. at 75:14-21 (Cairns).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government: "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878).  In determining whether a consent to search was free from coercion, a court should consider physical mistreatment, use of violence, threats, deception or trickery, and the physical and mental capacity of the defendant within the totality of the circumstances.  See United States v. McCurdy, 40 F.3d at 1119.

Upon a careful consideration of the circumstances, the Court finds that Huerta-Rodriguez freely and voluntarily gave the agents consent to search his home.  The United States has proffered clear and positive testimony that Huerta-Rodriguez' consent was specific, unequivocal, and intelligently given.  The United States has introduced into evidence the Consent to Search that Huerta-Rodriguez signed, which explained in Spanish Huerta-Rodriguez' rights -- including his right to decline consent to the search.  Gallegos testified that he read the consent form to Huerta-Rodriguez before Huerta-Rodriguez signed the form.  The Court finds that Gallegos informed Huerta-Rodriguez of his rights, and that Huerta-Rodriguez intelligently and unequivocally waived those rights when he signed the Consent to Search and gave verbal consent to the search.  The officers did not use implied or express duress or coercion to obtain Huerta-Rodriguez' consent.  The officers did not physically touch Huerta-Rodriguez.  Although Huerta-Rodriguez asserts that he gave consent only because the officers intimidated him by pointing their weapons at him, his wife, and

-33-

his children, the Court has credited Gallegos' testimony that the officers did not draw their weapons. Although the officers were armed, the presence of a holstered firearm -- without more -- does not contribute to the coerciveness of the encounter, and there is not much of anything more here.  United States v. Drayton, 536 U.S. at 205 (stating that, although an officer's display of a weapon may contribute to the coercive nature of a situation, "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon").  This case is distinguishable from Bumper v. North Carolina, where the Supreme Court found that the warrantless search could not be justified as lawful on the basis of consent when the consent was given only after the officers asserted that they possessed a search warrant, because the Court has credited Gallegos' testimony that the officers did not tell Huerta-Rodriguez and Munoz that they had a search warrant for their home.

Given the totality of the circumstances, the Court finds that Huerta-Rodriguez freely and voluntarily consented to the search, because the two officers did not physically touch Huerta-Rodriguez, did not draw their weapons, did not use raised voices, did not tell Huerta-Rodriguez that they had a search warrant for the home, and told Huerta-Rodriguez that he had the right to refuse consent.  See United States v. Pena-Sarabia, 297 F.3d at 984 (stating that the defendant's consent was not produced through coercion or duress, as the officers testified that the defendant voluntarily allowed the police to enter the home, the police did not draw or display their weapons, the police did not physically touch the defendant, or the police did not induce consent through threats, or trickery).  Although  Huerta-Rodriguez subjectively believed that he had to consent to the search, his subjective state of mind does not overcome the other indicia that his consent was freely and voluntarily given.  See United States v. Hill, 199 F.3d at 1150 ("While [the defendant's] 'subjective state of mind' regarding police officers 'may be relevant to some degree to the issue of the

voluntariness of [his] consent,' we hold that, in this case, it does not overcome the other indicia that

[the defendant's] consent was freely and voluntarily given.").

## II.   THE OFFICERS DID NOT VIOLATE HUERTA-RODRIGUEZ' FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WHEN THEY QUESTIONED HIM.

Huerta-Rodriguez contends that the Court should suppress the statements he made -- such

as his statement that there was a firearm in his residence -- because the officers were conducting a

custodial interrogation and Huerta-Rodriguez was not given the warnings that Miranda v. Arizona

requires.  See Motion to Suppress at 1.  Miranda v. Arizona warnings are required only when a

suspect is in custody.  See United States v. Torres-Guevara, 147 F.3d 1261, 1266 (10th Cir. 1998).

A person is not in custody solely because law enforcement officers question him, and a consensual

encounter does not become custodial solely because the person being questioned is the target of an

investigation.  See United States v. Guerrero-Hernandez, 95 F.3d at 986.  In determining the

custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the

suspect's position would have understood the situation as the functional equivalent of formal

arrest.'" United States v. Chee, 514 F.3d at 1112.  Huerta-Rodriguez' encounter with the officers

was consensual at the time he admitted that there was a firearm in his residence, because: (i) the

officers spoke to Huerta-Rodriguez in his home, see United States v. Ritchie, 35 F.3d 1477, 1485

(10th Cir. 1994)(stating that courts are less likely to find the circumstances to be custodial when the

interrogation occurs in familiar or neutral surroundings, such as the suspect's residence); (ii) the

officers did not draw their weapons, physically touch Huerta-Rodriguez, or raise their voices, see

United States v. Ritchie, 35 F.3d at 1485 (stating that the defendant was not in custody for purposes

of Miranda v. Arizona when the agents "never held him at gunpoint, handcuffed him, or otherwise

used force or threat of force"); and (iii) Gallegos informed Huerta-Rodriguez that he was free to

-35-

leave, and that he had a right to refuse or withdraw his consent, <u>see</u> <u>United States v. Torres-Guevara</u>,

147 F.3d at 1266 (finding that the defendant's encounter with the officers was consensual at the time

of her admission when the officers asked permission to speak with the defendant and she consented,

and when the officers informed the defendant that she was free to leave, and did not touch or

physically restrain her during the questioning).  Accordingly, Huerta-Rodriguez was not entitled to

<u>Miranda v. Arizona</u> warnings before his admission.[22]  The Court therefore will not suppress Huerta-

Rodriguez' statements.

      **IT IS ORDERED** that the Defendant's Motion to Suppress Evidence (Doc. 24) is granted

in part and denied in part.  Defendant Antonio Huerta-Rodriguez' request for an evidentiary hearing

is granted.  The motion is otherwise denied.

---

[22] Even if the officers had probable cause or reasonable suspicion that Huerta-Rodriguez had committed a crime when they initiated the encounter, Huerta-Rodriguez was not subject to custodial interrogation.  <u>See</u> <u>United States v. Hudson</u>, 210 F.3d 1184, 1192 (10th Cir. 2000)("Alternatively, to the extent the district court's order could be read to stand for the proposition that [the defendants] were in custody because the [be-on-the-lookout report] gave [the officer] probable cause to arrest, that conclusion is similarly at odds with Supreme Court precedent.")(citing <u>Berkemer v. McCarty</u>, 468 U.S. at 435 n.22).  The Supreme Court in <u>Berkemer v. McCarty</u> stated:

> Turning to the case before us, we find nothing in the record that indicates that respondent should have been given Miranda warnings at any point prior to the time Trooper Williams placed him under arrest. . . .  Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent.  A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

468 U.S. at 441-42 (citations and footnotes omitted).  Because, under the circumstances that the Court has found existed, a reasonable person in Huerta-Rodriguez' position would not have understood the situation as the functional equivalent of formal arrest, Huerta-Rodriguez was not in custody, regardless of whether the officers had probable cause or reasonable suspicion that he had committed a crime when they initiated the encounter.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Norman Cairns
   Assistant United States Attorney
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Mario A. Esparza
Las Cruces, New Mexico

  *Attorney for the Defendant*